IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
FEBRUARY 2000 SESSION

## STATE OF TENNESSEE v. ROBERT RAINEY

**Appeal from the Circuit Court for Hardin County**
**No. 7750     C. Creed McGinley, Judge**

---

**No. W1999-00692-CCA-R3-CD - Decided April 25, 2000**

---

The Defendant, Robert Rainey, was found guilty by a Hardin County jury of attempted first degree murder, attempted second degree murder, theft of property, and setting fire to personal property. In this appeal as of right, he challenges the sufficiency of the evidence, the failure of the trial court to apply a mitigating factor in sentencing, and the failure of the trial court to charge the jury with reckless endangerment as a lesser included offense of attempted first degree murder. We affirm the judgment of the trial court.

**T. R. A. P. 3; Judgment of the Trial Court Affirmed**

JUDGE DAVID H. WELLES, delivered the opinion of the court, in which JUDGE JOSEPH M. TIPTON, and SENIOR JUDGE L.T. LAFFERTY, joined.

Richard W. DeBerry, Camden, Tennessee, for the appellant, Robert Rainey.

Paul G. Summers, Attorney General and Reporter, J. Ross Dyer, Assistant Attorney General, Elizabeth Rice, District Attorney General, and John W. Overton, Jr., Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

In this appeal as of right, the Defendant, Robert Rainey, challenges his convictions of attempted first degree murder, attempted second degree murder, theft of property, and setting fire to personal property. In so doing, he raises the following three issues: (1) whether the evidence was sufficient to support the convictions; (2) whether the trial court erred in failing to apply a mitigating factor in sentencing the Defendant; and (3) whether the trial court erred in failing to charge reckless endangerment as a lesser included offense.

At trial, the victim of the attempted first degree murder, Judy Rainey, testified that the Defendant was her ex-husband. On July 6, 1998, just a few days before their divorce was granted, Ms. Rainey was working the night shift at a Wal-Mart store in Savannah, Tennessee. She got off work at 9:00 p.m. Because she was afraid of her husband, she asked a co-worker to walk outside with her when she left. When the two went outside, Ms. Rainey did not see her husband's truck, so she told her co-worker to go ahead and leave. Ms. Rainey walked to her car and entered it from the driver's side. She said that she saw a man pushing shopping carts approach the front of her car. The man was wearing an orange vest like those worn by Wal-Mart employees, he had dark-looking hair, and he had on glasses. The man's hair was darker than her husband's hair, and she did not recognize him when he approached. She said that the man pushed the carts between her car and the next one, and then he entered her car from the passenger's side. He put his arm around her neck, and when she started "hollering for help," he told her to "shut [her] damn mouth or he would kill [her] right there." Once the man spoke, Ms. Rainey realized that it was her husband. He held some type of a sharp blade against her neck. Ms. Rainey said that she began to flash her automobile headlights on and off in an effort to summon help. Her husband had his hand over her mouth, and she bit his finger as hard as she could. He loosened his grip, and she managed to push his arm away from her neck and exit the vehicle. She ran back towards Wal-Mart, and her husband drove away in her car.

Ms. Rainey also testified that about two weeks after this happened, she went to her husband's trailer, where she had once lived, to check on things. She found two pictures in the bottom of a cabinet drawer with her husband's writing on them. One was a picture of their bed, and the other was a picture of the burial plot where Ms. Rainey and her husband had planned to be buried. The plot, which should have been vacant, contained two stakes with flowers on top of them.

Barbara Conner, Ms. Rainey's co-worker, testified that she walked outside with Ms. Rainey on July 6, 1998. As she was walking toward her car, she saw a person, who was wearing an orange vest, pushing shopping carts in the parking lot. After Ms. Conner got in her car, she heard "hollering," and she saw headlights "blinking." She got out of her car and saw Ms. Rainey running toward Wal-Mart, yelling "He's trying to kill me" and "Call 911." She then saw Ms. Rainey's car leave quickly. Ms. Conner said that she went back inside Wal-Mart to be with Ms. Rainey. When she did, she saw marks and scratches on Ms. Rainey's neck that had not been there before.

Rhonda McDonald, the daughter of Ms. Rainey and the Defendant, testified that her parents' marriage "was not good." She said that the Defendant drank a lot and that he was always "hard" on her mother. She testified that her mother had taken out an Order of Protection against the Defendant because the night her mother left the Defendant, the Defendant had "snapped a gun" at her mother. She also said that one time the Defendant stated that her mother "made him so mad that he could cut her throat." The Defendant did not want the divorce, and he repeatedly tried to get Ms. Rainey to return home. Ms. McDonald testified that Ms. Rainey stayed at various locations after she left the Defendant so that the Defendant could not find her.

Officer Brian Rich testified that he was working for the Hardin County Sheriff's Department on the night of July 6, 1998, when he received a call that the Defendant and Ms. Rainey had been

involved in a domestic dispute and that the Defendant had stolen her vehicle. He went to the Defendant's residence, which was a trailer located behind Rainey's Grocery store in the Poplar Springs area of Hardin County. When he arrived, the two gas tanks outside the store and Ms. Rainey's vehicle were on fire. Officer Rich parked and exited his vehicle. He said that he took one or two steps from his vehicle when several high-powered rifle shots were fired at him. He said that at least seven or eight shots were fired. Several shots struck his police vehicle on the driver's side. He ran from the vehicle and was picked up by a gentleman in a pickup truck. Officer Rich then called for emergency assistance.

Once the other officers arrived on the scene, the officers attempted to approach the residence through the woods. Several more shots were fired at the edge of the woods, causing the officers to retreat and take cover. The officers then set up a perimeter around the residence and began negotiating with the Defendant by telephone. Officer Rich did not hear the telephone negotiations, but he did hear the Defendant "yelling" out the door. He said the Defendant was demanding that the officers bring his wife and one of his sons to him. The standoff and negotiations continued for about six or seven hours, and then the officers heard a muffled gunshot. They entered the trailer and found the Defendant in the back bedroom laying face down on the bed. He had shot himself in the face. The officers found the gun and found blood in the other bedroom. An ambulance was called, and the Defendant was taken to the hospital.

Jonathon Reclusado testified that he was on his way home about 9:30 or 9:45 on the evening of July 6 when he saw a glow in the sky. As he got closer, he noticed that gas tanks and a car were on fire at Rainey's store. He saw Officer Rich stop in front of the store and get out of his patrol car. As he did, shots were fired. Mr. Reclusado said that the officer ran towards his truck, and he picked up the officer and drove further down the road. He stated that the shots were fired toward the officer and the officer's car. The shots hit the police car and hit the ground about two or three feet behind the officer as he was running. Mr. Reclusado heard five to seven shots fired.

Christopher Carpenter, a special agent with the Tennessee Bureau of Investigation, was called to investigate the shooting at the Defendant's trailer. He arrived at the scene about 4:30 in the morning, after the Defendant had been taken to the hospital. The store and car were already burned by this time. A gas nozzle was found in the rear of the burned vehicle.

Agent Carpenter found eleven fired hulls from a .30 caliber rifle outside the door to the trailer. He entered the trailer and discovered a large amount of disarray. There was cooking oil all over the floor and shaving cream on the walls. The refrigerator door was open, and the contents were spilled out onto the floor. Two boxes of ammunition were on the kitchen table. A knife was found in the middle of the living room floor. In a small bedroom, Agent Carpenter discovered puddles of blood on the bed, along with a partial dental bridge with some teeth attached. A rifle was found on the floor, and there was a hole in the ceiling directly above the bed. Six live rounds and one fired round were found in the rifle. In the master bedroom where the Defendant had been found, there was a blood pool on top of the bed. In the bathroom, Agent Carpenter saw a hair dye kit on the floor. He said that there was hair dye all over the toilet, all over the floor, and all over the sink.

Agent Carpenter also retrieved a surveillance video of the parking lot at Wal-Mart. He played the video for the jury and described its contents. The tape showed two individuals walking toward a group of parked cars. The individuals split apart and went to separate cars. One of the individuals went to her car and entered from the driver's side. A third individual walked around the front of the car and went to the passenger's side. The door opened and the interior light came on. Some motion occurred inside the car, and then the lights started to flash in a rapid, erratic motion. The tape showed an individual exit the vehicle and run back towards Wal-Mart. It then showed the vehicle driving off in a "hurried" manner.

The Defendant testified in his own behalf, denying that he intended to harm either Ms. Rainey or Officer Rich. He said that he had heart problems for which he took nitroglycerine. He said he did not want the divorce, and he begged Ms. Rainey to come home. He said that he at least wanted her to stay until his medical condition improved. He stated that he would go to Wal-Mart and leave love notes on her car door. He left them on her car because he was afraid she would call the police if she saw him. He said that eventually he "got up enough nerve" to wait on her at Wal-Mart, and he asked her to call him. He said he would take her money and cigarettes to Wal-Mart, and he would leave her food in her car.

On the night of July 6, 1998, he went to Wal-Mart as he said he did every night. He parked his truck behind Wal-Mart because he was afraid Ms. Rainey would call the police if she saw his vehicle. He put on an orange vest that he had in his truck. He said that he started pushing carts around, and then he sat down and filed his fingernails with an emery board. He testified that he had on his regular glasses and that he had not dyed his hair. He saw Ms. Rainey come out of Wal-Mart and walk to her car. He said he pushed some carts into the cart return location behind the car and then went around and sat down beside her on the driver's side. He stated that she then started yelling, "He's here! He's here." Another lady came up and said, "Who's here, Judy?," and she replied, "My husband! My husband!" He stated that he knew "the law had grabbed [him] by the hand," and when Ms. Rainey got out of the car, he "cranked the car up and went home." He said that home was all he could think of at that time. He denied putting a knife to Ms. Rainey's throat, and he suggested that he might have had the emery board in his hand which could have caused the marks. He also denied putting his arm around her neck. He said that he would not hurt her.

After driving away in Ms. Rainey's car, the Defendant drove the car back to the store. He put a gas nozzle inside the car, turned the pumps on, and then set the car on fire. He said that he thought, "Well, why not just get shed of everything while I'm at it. My life is gone anyway. It makes no difference." He went into the trailer and got his gun. He said he saw the police car pull up, and he shot the gun in the air the first time. He said he was not trying to hurt Officer Rich when he shot the gun. He stated that after the first shot, it was at least thirty minutes before he shot the car. He said no one was in the car at the time. He remembered shooting himself, but he could not explain what he was thinking at the time.

The Defendant denied having dyed his hair. When asked about the hair dye that was all over the bathroom, the Defendant responded, "Somebody come [sic] in there after I shot myself and done

[sic] that." He had the same reply when asked about the items thrown around inside the trailer. When asked about the knife that was found in his floor, the Defendant stated, "Somebody put that there like they did the hair dye and the other stuff." He said that he had never seen the pictures which Ms. Rainey found in the trailer, but when asked if it was his handwriting on the pictures, he stated, "I couldn't swear if it was mine or not. It looks like it, but I couldn't swear it's mine."

## SUFFICIENCY OF THE EVIDENCE

The Defendant first challenges the sufficiency of the evidence. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307 (1979). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1976), and State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977)); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Holt v. State, 357 S.W.2d 57, 61 (Tenn. 1962).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914 (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191 (citing Cabbage, 571 S.W.2d at 836). Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914.

On appeal, the Defendant asserts that the evidence was insufficient because the Defendant testified that he did not try to kill his wife or Officer Rich, because Officer Rich testified that he did not think he was a specific target of the Defendant, because the Defendant testified that he did not put a knife to his wife's throat, and because the Defendant testified that the reason he took his wife's car was to get home. This argument completely ignores the overwhelming evidence of guilt offered by the State and instead merely points out conflicts in the trial testimony, which must be resolved in favor of the jury verdict. See id. After reviewing the evidence, we are convinced that the evidence is more than sufficient to support all of the Defendant's convictions. This issue is therefore meritless.

## SENTENCING

The Defendant next contends that the trial court erred in sentencing the Defendant. Although in phrasing his issue he asserts that the trial court erred in its use of enhancement factors in setting

the length of the Defendant's sentences, he argues only that the trial court erred in failing to apply as a mitigating factor that the Defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offenses.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The presumptive sentence for Class B, C, D, and E felonies is the minimum sentence in the range if there are no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c). For a Class A felony, the presumptive sentence is the midpoint in the range if there are no enhancement or mitigating factors. See id. If there are enhancement factors but no mitigating factors, the trial court may set the sentence above the presumptive sentence but still within the range. See id. § 40-35-210(d). If there are enhancement and mitigating factors, the trial court is to start at the presumptive sentence, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. See id. § 40-35-210(e).

All of the sentences imposed by the trial court were within the range established by the legislature for a Range I standard offender. See id. § 40-35-112(a). The Defendant presents no argument suggesting how the trial judge erred in its application of enhancement factors. Because no issue relating to enhancement factors is supported by argument, any such issue is waived. Tenn. R. Ct. Crim. App. 10(b).

We reject the Defendant's contention that the trial court erred in failing to apply as a mitigating factor that the he was suffering from a mental or physical condition that significantly

reduced his culpability for the offenses. See id. § 40-35-113(8). At the sentencing hearing, the trial judge stated, "There was proof here that perhaps a mental situation existed, depression or whatever, that might have affected his actions. But that was rejected by the jury and it's also rejected by this Court. I find no grounds to excuse or justify his conduct in any way. His conduct is reprehensible. He is responsible for it." At trial, Dr. Samuel Craddock, a psychologist with the Middle Tennessee Mental Health Institute, testified that his facility evaluated the Defendant to determine whether he was competent to stand trial and whether there might be a basis for an insanity defense. After completing the evaluation, the facility determined that although the Defendant suffered from depression, he was competent to stand trial and there was no basis for an insanity defense. Dr. Craddock testified that the Defendant was aware of his actions and that the Defendant could comprehend what he was doing. He said that the Defendant had the capacity to appreciate wrongfulness. The Defendant was capable of caring for himself and did not need to be placed in any type of mental facility. This testimony certainly does not strongly support the application of this mitigating factor. The evidence certainly does not preponderate against the trial court's determination that the Defendant did not suffer from a mental condition which significantly reduced his culpability for his crimes.

## LESSER INCLUDED OFFENSE

Finally, the Defendant asserts that the trial court erred in failing to instruct the jury on reckless endangerment as a lesser included offense of attempted first degree murder. We note that while the Defendant asserts in his brief that the trial court should have charged the jury on reckless endangerment, he offers no argument concerning why reckless endangerment should have been charged or why the failure to charge reckless endangerment constitutes reversible error. He merely quotes some language from State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), which indicates that the trial court must instruct the jury on offenses necessarily included in the offense charged. See id. at 310. Again, pursuant to Rule 10 of the Rules of the Court of Criminal Appeals, we may treat issues which are not supported by argument, citation to authorities, or appropriate references to the record as waived. Notwithstanding, we will briefly address the Defendant's contention.

Apparently, the State concedes that reckless endangerment is a lesser included offense of attempted first degree murder because it argues only that the failure to instruct on reckless endangerment was harmless. We agree with the State that any failure to instruct was harmless error.

Attempted first degree murder is committed when a person attempts the premeditated and intentional killing of another person. See Tenn. Code Ann. § 39-13-202, 39-12-101. The offense of reckless endangerment is committed when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103. Because we conclude that all the statutory elements of reckless endangerment are included within the statutory elements of attempted first degree murder, we conclude that the former is a lesser included offense of the latter. See State v. Burns, 6. S.W.3rd 453, 466 (Tenn. 1999).

A trial court is under the mandatory duty to instruct the jury on a lesser included offense, even if such an instruction is not requested, when "any evidence exists that reasonable minds could accept as to the lesser-included offense" and when that evidence is "legally sufficient to support a conviction for the lesser-included offense." Burns, 6 S.W.3d at 469. See also Tenn. Code Ann. § 40-18-110(a). We conclude that the trial judge erred by not instructing the jury on the lesser included offense of reckless endangerment. Notwithstanding, the failure to instruct on a lesser included offense is subject to harmless error analysis. See State v. Williams, 977 S.W.2d 101, 105 (Tenn. 1998).

In State v. Williams, the defendant was charged with and convicted of first degree premeditated murder. See id. at 102. The trial court refused to instruct the jury on voluntary manslaughter as a lesser included offense, but it did instruct the jury on the lesser included offenses of second degree murder and reckless homicide. See id. at 102, 104. The trial court also instructed the jury as follows:

> You must first determine if the defendant is guilty of the offense of murder in the first degree as charged in the indictment. If you agree that the defendant is guilty beyond a reasonable doubt of murder in the first degree, you may stop your discussions and return your verdict.
>
> If you have a reasonable doubt as to the defendant's guilt of murder in the first degree, then your verdict must be not guilty as to this offense, and then you shall proceed to determine his guilt or innocence of the lesser included offense of murder in the second degree.

Id. at 106. In holding that the failure to instruct on voluntary manslaughter was harmless, the supreme court stated,

> It is an elementary principle of law that jurors are presumed to follow the instructions of the trial court. By convicting the defendant of first degree murder the jury determined that the proof was sufficient to establish all the elements of that offense beyond a reasonable doubt . . . . In other words, by finding the defendant guilty of the highest offense to the exclusion of the immediately lesser offense, second degree murder, the jury necessarily rejected all other lesser offenses, including voluntary manslaughter. Accordingly, the trial court's erroneous failure to charge voluntary manslaughter is harmless beyond a reasonable doubt because the jury's verdict of guilty on the greater offense of first degree murder and its disinclination to consider the lesser included offense of second degree murder clearly demonstrates that it certainly would not have returned a verdict on voluntary manslaughter.

Id. (citations omitted).

We reach a similar result in this case as well. The Defendant was charged with two counts of attempted first degree murder. The trial court charged the jury with the lesser included offenses

of attempted second degree murder and attempted voluntary manslaughter on both counts. The trial court also instructed the jury that it should consider the lesser offenses if it had reasonable doubt as to the greater. The jury returned a verdict of guilty as charged of attempted first degree murder with respect to the victim Judy Rainey, and it returned a verdict of guilty of the lesser included offense of attempted second degree murder with respect to the victim Brian Rich. The jury thus rejected two lesser offenses in finding the Defendant guilty of attempted first degree murder, and it rejected one lesser offense in finding the Defendant guilty of attempted second degree murder. Because the jury rejected lesser offenses which were charged, it necessarily rejected any lesser offenses which were not charged. See id. Accordingly, we hold that the failure to charge the jury on reckless endangerment was harmless, whether viewed under Rule 36(b) of the Tennessee Rules of Appellate Procedure, Rule 52(a) of the Tennessee Rules of Criminal Procedure, or under the constitutional standard of beyond a reasonable doubt. See State v. Williams, 977 S.W.2d 101, 105-106 (Tenn. 1998).

The judgment of the trial court is affirmed in all respects.

David H. Welles, Judge
Joseph M. Tipton, Judge
L.T. Lafferty, Senior Judge